Good morning. Good morning. Good morning. Hello again. May it please the court. My name is Eitan Kaslyanich. I'm representing Timothy Dewey in this appeal. Dewey worked as a roofer until he had an accident on the job, slipped and fell. He ended up having to have back surgery, and he's never really recovered from that. He's had periods where he got somewhat better, but he never reached the point where he could actually do any kind of full-time work. I want to jump right to the big issue here that's the big problem with the ALJ's decision. The ALJ picked out a couple of treatment notes. One is from December 2007. One is from January 2008, in which Dewey's treating neurosurgeon, Dr. Lange, stated he could possibly do these jobs. He was releasing him for light-duty work, and then he also said there was a particular job that he was releasing him for. Okay, those are snapshots. The problem is, from January 2008 and beyond that, the ALJ does not discuss any of the clinical findings from Dewey's treating neurosurgeon, Dr. Lange, or from the nurse practitioner who worked in his office and in close tandem with him. That was Ms. Peterson. This case is really, I think the outcome here is controlled by Marsh, because in Marsh, there was a similar problem where an ALJ had failed to discuss the treatment notes from a treating physician. Here, the ALJ did not completely fail to discuss the notes. He just didn't discuss any beyond January 2008. Now, in my view, Dewey didn't even apply for benefits until December of 2008. That was when he finally reached the point that he figured, I better apply because I am not getting better. He did not discuss any, and his date last insured is December of 2009. Now, an ALJ is required to base his decision on all the evidence. Let me ask you, because in February of 2009, it looks like Dr. Lange wrote, I strongly recommend he continue his retraining, and I fully anticipate he will be able to work full-time after completion of training. What are we to make of that? That's at ER 597. Well, two different things. One is that Dr. Lange was very much interested in encouraging his patient to continue with his vocational rehabilitation, which he'd been doing religiously for a number of years, trying to get training. They had to keep switching the training because he was having trouble concentrating on stuff. He wasn't doing that well, and they were finding there were things he was training to do that he couldn't do. But that, once again, that's a snapshot. If you look, it doesn't excuse the ALJ, and the ALJ didn't mention that. The ALJ didn't give that as a reason for finding Dewey not credible. The ALJ did rely on Dr. Lange, and Dr. Lange consistently very much seemed to convey that Mr. Dewey could and should continue to work. Well, he wasn't actually working. He was trained so that he could be working. And to this day, he's continuing to participate in vocational rehabilitation in an attempt to figure that out. Now, I do cite in my briefs, there's a Social Security regulation that says that if you're disabled, unable to do any kind of work, but you're participating in a vocational rehabilitation program, your benefits should continue until you complete the program. And he's never been able to complete the program. And he's never, throughout this time that he's been participating, there's a big difference between going to school where they're accommodating him with a sit-stand desk in every classroom and being able to do that on the job. There's no requirement that employers accommodate your needs. The other thing, and I think this is a big, you know, very limiting, it required a stand-at-will option. It required, you know, that he be able to use a cane while ambulating. Well, what it didn't include, and that's where the problem is, what it didn't include is that he can't tolerate sitting hardly at all. Sitting is the worst thing for him. And after 20 minutes of sitting, he's getting muscle spasms and needle pains. He's a mess. It also doesn't account for the concentration problems that he has as a result of the pain medications he has to take. And it doesn't account for his need to actually lie down at times to relieve the pain. All of that was addressed. Help me with my mental block here. You have a treating board-certified neurologist, a treating board-certified physical rehabilitation medicine specialist. You have a counselor psychologist, all of whom agree. And you had a medical records examiner, this Dr. Staley. All of these people agree. If you have a treating board-certified neurologist who is invested in the treatment of the patient and the recovery of the patient who testifies adverse to the interests of the patient, that is simply highly, highly credible, is it not? There's no doctor that disagrees with what they say. What you argue is two things. One, that the ALJ relied too much on a treating neurologist. And secondly, that there were some subjective complaints by Mr. Dewey and his girlfriend. They find some of those complaints and subjective complaints are consistent. Many are not. And they conflict with what the physical, what they, in their opinion, think the physical limitations are. So why don't we put great, just like the ALJ did, great credibility in treating specialists, board-certified specialists? Okay. It's not the job of this court to weigh the evidence. And that's, with all due respect, what I'm finding is happening, what you're actually asking me about. No, but it is the ALJ's job. And so I think Judge Murray's concern is when the ALJ has credited these physicians, why isn't that reasonable? Because, in this case, the ALJ did not weigh the evidence. The ALJ does not mention one single clinical finding from any of the treating physicians, either the treating neurosurgeon or from the nurse who worked with him. There is not one word of their clinical finding from January of 2008 forward. Now, I'm not asking this court to re-weigh the evidence. I'm asking this court to find if the ALJ failed to comply with his duty to weigh that evidence in the first instance. Because those clinical findings, beginning in January 2008 and continuing through the rest of the evidence, show that he was having positive, bilateral positive straight-leg raising tests. He was having many problems. He was having to ambulate and could barely, there are notes where he could barely sit, or there are notes where he couldn't lean, he couldn't straighten his body. There's a lot of evidence. And if the ALJ had addressed that evidence and said, well, I find it's more persuasive what Dr. Lange said in January of 2008, it would be a different issue. I think that would still be incorrect because I think his decision to weigh the evidence. But here he didn't weigh the evidence. He simply disregarded it completely. That's what I see the problem here. Did you want to reserve your minute and a half? I would appreciate that. Thank you. May it please the Court, I'm Summer Stinson, representing the Acting Commissioner of the Social Security Administration. For brevity's sake, I'll refer to the Acting Commissioner as the Commissioner. The Commissioner's final decision is supported by substantial evidence and is free from firm belief. The relevant time period at issue here is from June 6, 2005, Mr. Dewey's alleged onset date, to December 31, 2009, his last insured date. The ALJ properly relied upon and accommodated the opinion of Mr. Dewey's treating neurologist, Dr. Lange. In October 2006, Dr. Lange stated that Mr. Dewey had significantly improved. Dr. Lange advised against treating Mr. Dewey with further surgical intervention and that Mr. Dewey should continue to be active because the herniation was reabsorbing on its own. In December 2007, Dr. Lange advised Mr. Dewey's vocational counselor that, quote, he did not have objective findings to suggest that he would be unable to perform full-time work on a regular basis, end quote, and he believed that Mr. Dewey was capable of working eight hours a day, five days a week. After a study in January 2008 showed normal nerve conduction in Mr. Dewey's legs, Dr. Lange opined that Mr. Dewey could perform office work that would not involve going up on a roof. Specifically, Dr. Lange noted that he had spoken with Dr. Dewey, I mean, sorry, Mr. Dewey, about a job offer for a light office work position, and Dr. Lange approved the position. Let me ask you, I understand everything that you're pointing out. You know, it looks like Dr. Lange was a very positive person and a positive doctor and was very encouraging of, looks like, you know, looks like he would encourage his patients and hear Mr. Dewey to be active and to do things. But it seems from the record, at least from my reading, that Mr. Dewey was in considerable pain and that it increased, you know, during the time that he was, or it progressed, it seems. What do we make of the evidence in the record that, you know, while Mr. Dewey attended school full-time, he did so with, you know, considerable difficulty and sometimes had to leave class early just because of the high level of discomfort or pain? Well, and he said that he had only missed a few days of class and that he did say that he had to go home and lay down afterwards. But quite honestly, I think there's a lot of people that go home from work and want to lay down. He was able to do those things, though. He continued to go to school. He was taking 12 credits. It wasn't like he was just taking a class here or there. Twelve credits is a full load. And so he was taking a full load of classes. And he also asked, Dr. Lange had approved light office work, which light work is more than sedentary, which is what he was restricted to by the ALJ in this case. And what about the finding of Dr. Lange after, I think it was January of 2008, that Dewey could work and that Mr. Dewey had, he called it left S1 root dysfunction because of the gastroenteritis atrophy? And so if you look at the notes of Dr. Lange after January 2008, in April of 2008, he also had a progress note saying that Mr. Dewey was good with his hands, that he performed well in his aptitude and skills test, and reported wanting to complete his GED and obtaining retaining as a dental lab assistant.  He never said that Mr. Dewey was not able to do full-time light work. Rather, Dr. Lange's progress notes from November of 2008 reflect that Mr. Dewey's symptoms were essentially unchanged. Mr. Dewey continued, quote, continued with school and feels he is tolerating it fairly well, and that Dr. Lange would, quote, continue to monitor his systems as he moves into the next quarter of school. So even looking at those progress notes after January of 2008 shows that he was tolerating school fairly well. So here, an error is harmless if it is inconsequential. The commissioner says that no error happened here, but even if there was error, it's inconsequential to the determination that a claimant is not disabled based upon the full record. Mr. Dewey has the burden to demonstrate not only the presence of error, but also that that error affected his substantial rights, and that's from Ludwig. Because an error need not only be more probable probably than not harmless, Mr. Dewey must show that an error, quote, likely affected the outcome, and that's from Molina. And Mr. Dewey has not met this standard here. To support the finding that Mr. Dewey was not fully credible, the commissioner reasonably relied upon inconsistencies, first, inconsistencies between his subjective complaints and his reported activities, such as taking a full load of college courses five days a week, second, his reports that he improved when he used behavior modification techniques, and third, the objective medical evidence that showed that he was not as limited as he claimed. Importantly, Mr. Dewey performed a full range of daily activities, including attending college full time, that were inconsistent with his subjective complaints. Contradictions between a claimant's reported activities and his asserted activities are clear and convincing reasons to discount a claimant's credibility. Here he was taking a full load of college courses and attending school five days a week. He reported to one provider, Dr. Lange, that he was tolerating the classes fairly well and taking 12 credits. He also reported that he did have a sit-stand option in class, and the sit-stand option was wrapped into the residual functional capacity as addressed by the ALJ. The ALJ may properly rely upon a claimant's higher education classes and successes when weighing the testimonial evidence. And that comes from Bayless and Carmichael. Here the ALJ also consulted a vocational expert and incorporated Mr. Dewey's requirement of a sit-stand option at will into his hypothetical question to the vocational expert. The vocational expert testified that a person with his impairments could perform the sedentary jobs of order clerk, sorter, and assembler, and surveillance systems monitor, and that these jobs could be performed by a person who also needed to use a cane. The vocational expert also further testified that his testimony was consistent with the Dictionary of Occupational Titles. Here the dictionary is silent as to whether the jobs in question allow for a sit-stand option, but because the dictionary is silent on the sit-stand issue, the vocational expert's testimony supplemented the dictionary rather than conflicting with it. Because the ALJ properly analyzed the evidence of record, the commissioner met her burden at step five by relying on the vocational expert's testimony that Mr. Dewey was able to perform work as a sorter, assembler, and surveillance systems monitor. The ALJ properly found that Mr. Dewey was not disabled within the meaning of the act, and the district court's decision should be affirmed. Thank you. Thank you. On pages 11 through 20 in my opening brief, I summarize the significant medical clinical findings from the treating physicians that the ALJ never mentioned. He completely ignored. I had to summarize them in my brief. If you want to see those, you can sift through the file, or you can look at my brief where I've got them spelled out. And the reason that they've got to be spelled out in such detail is there's not one word from any of that in the ALJ's decision. The ALJ's failure to address all of that significant evidence fully undermined his finding that there was not sufficient evidence to support Dewey's complaints of the limitations and the symptoms he was experiencing. That's the evidence that supports his complaints. But the ALJ didn't mention any of it. Once again, that's what I see. The error here is an ALJ cannot simply disregard clinical findings for getting almost a year before the application date and continuing right through the entire file. Are you talking about clinical findings or complaints? I'm talking about the clinical, objective clinical findings. These treatment notes also reflect complaints. They also reflect the symptoms. A good doctor is going to say, he came in, he complained about this, and then I tested him, he had positive straight leg raising tests bilaterally. So you've got both. The problem here is when an ALJ completely disregards, gives no weighing whatsoever of any of those clinical findings, what are we reviewing here? We're reviewing an ALJ decision that's not supported by substantial evidence because he didn't, consistent with Marsh, he did not address significant clinical findings that support the claimant's complaints. It just undermines the entire analysis. Thank you very much. Thank you. Thank you both for your helpful arguments. The matter of Dewey v. Colvin will be submitted.
judges: Graber, Murguia, Bury